UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN REMBISH,

    Petitioner,

v.

BONITA HOFFNER, *Warden*,

    Respondent.

Case No. 2:17-cv-11120-LJM-PTM
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING PETITION FOR HABEAS CORPUS [1], DENYING CERTIFICATE OF APPEALABILITY, AND GRANTING THE RIGHT TO PROCEED IN FORMA PAUPERIS ON APPEAL**

---

    In December 2010, Steven Rembish and Jonathon Jones were charged with, among other things, the murder of Sean Stennett and the assault of Katie Allen. At trial, the prosecution's theory was that Rembish and Jones showed up at Allen's house as vigilantes of sorts. According to the prosecution, Rembish (or Jones) were out to kill someone who had molested Rembish's girlfriend when she was young. Thinking Stennett was that person, one or both of them shot Stennett. A Michigan jury convicted Rembish (and Jones) of, among other crimes, first-degree, premeditated murder. Rembish is now serving life in state prison with no possibility of parole.

    Rembish seeks a writ of habeas corpus from this federal court. He argues that the evidence did not support his convictions and that there were a number of other trial-related errors of constitutional magnitude. For the reasons that follow, the Court either finds that 28 U.S.C. § 2254(d) bars relief or, where it might not, that Rembish's claims fail on *de novo* review.

# I.

## A.

The following are the facts as stated by the Michigan Court of Appeals supplemented by the facts as stated by Rembish.

On December 2, 2010, Sean Stennett was at Kaiti Allen's home. *People v. Rembish*, No. 308738, 2015 WL 122703, at *2 (Mich. Ct. App. Jan. 8, 2015). At about 2:30 a.m., "Stennett heard a knock at [the] front door." *Id.* "Allen went to the door, looked out a window, and saw two men." *Id.* Allen would later testify that she was 98% sure that the two men were African American (R. 6, PageID.255); Rembish is Caucasian. Apparently inferring that the two men would shoot, Stennett grabbed Allen's hand and threw her to the ground. 2015 WL 122703, at *2. "The men tried to enter the apartment; however, Stennett held the door shut with his feet, and the men ran away. Stennett received several gunshot wounds in the altercation and was taken to the hospital, where he died." *Id.*

"Two bullets were recovered from Stennett's body. These bullets, as well as bullets and spent shell casings found at the scene, were linked to a .45 caliber Glock brand pistol owned by Sean Berg." 2015 WL 122703, at *2. Berg was an acquaintance of Rembish and Jones.

Under a grant of immunity, Berg would later testify about what happened after the shooting. Berg told the jury that "he looked for the gun shortly after the shooting, but the gun was missing." 2015 WL 122703, at *2. Berg also testified that he "got a couple phone calls from [Rembish] and [Jones]." *Id.* Berg continued, "And in the phone calls they told me that they had shot the dude by my house, and they had used my gun. And that they were going to get me a new barrel, or a new gun, or money, in exchange." (R. 6, PageID.346.) Berg recalled that the day after their call, he drove to Rembish's house. (R. 6, PageID.347.) Berg testified, "And [Rembish] came

2

outside when I pulled up, I walked up and he just gave me a high five and said, 'smedler down.'" "Smedler" was a term Rembish and Jones used to refer to a child molester. (R. 6, PageID.348, 444.) According to Berg, Rembish and Jones "told him that they believed the person they shot had molested Rembish's girlfriend, Danielle Kuebler, when she was young." *Id.*

Rembish stresses that not only was Berg granted immunity to testify, he was interested in deflecting the police investigation away from himself. (R. 1, PageID.19 n.1.)

Brittany Kellman, Berg's girlfriend and Rembish's niece, also testified at the trial. She stated that not long before Rembish was arrested, she was at an apartment with her brother, Berg, Rembish, and possibly Rembish's girlfriend. (R. 6, PageID.288.) Kellman recalled Rembish telling the group that he would "man up to his mistake" and that "he wasn't going to let nobody else go down for what he did." (R. 6, PageID.288.) But Kellman conceded that Rembish never did say which "mistake" he would "man up" to. (R. 6, PageID.291–292.)

At trial, Danielle Kuebler, Rembish's girlfriend (at least for a time), was impeached with the transcript of her interview with a detective. The prosecution asked, "What did Steve [Rembish] tell you that he and [Jones] had done to the smedler?" After Kuebler answered, "Nothing," the prosecution read from the transcript of the detective's interview: "[']But you remember when Steve [Rembish] said we got that smedler, Babe[?'] And you answered; at [line] 1671: [']A. Yeah, it was on the news.['] . . . At page 32 of that same transcript . . . you were asked: [']Q. I want you to think hard, okay, because he has got a little different account of how things went down. What did he say about, what did he say about the smedler?['] And you answered: [']A. Oh, they thought that the reason, or they thought that the guy was the one that molested me when I was a child, and it was really terrible. It's not the right person.[']" (R. 6, PageID.446.) In response to this reading of the transcript, Kuebler testified, "I don't recall saying [any] of this. So it's there, you got it

3

highlighted. But I am not saying I said it because I don't recall saying it. . . . My whole story was twisted around." (R. 6, PageID.446.)

A Michigan jury convicted Rembish of a host of crimes including first-degree premeditated murder of Stennett and assault with intent to murder Allen. Rembish was sentenced to life without the possibility of parole.

**B.**

Rembish appealed. As relevant to the petition pending before this Court, Rembish raised two claims in his brief to the Michigan Court of Appeals: (1) that the evidence at trial was insufficient for a jury to find that he participated in the shooting of Stennett and (2) that the prosecutor committed misconduct by treating Kuebler's prior-inconsistent statements as substantive evidence and by vouching for Berg. (R. 6, PageID.604, 608, 614–615.) The Michigan Court of Appeals, consolidating four cases (two involving the Stennett murder, two involving another shooting death), affirmed Rembish's conviction. *See People v. Rembish*, 2015 WL 122703 (Mich. Ct. App. Jan. 9, 2015).

Rembish then filed an application for leave to appeal in the Michigan Supreme Court. The Michigan Supreme Court denied the application: "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Rembish*, 859 N.W.2d 696 (Mich. 2015).

**C.**

Rembish then returned to the state trial court via a motion for relief from judgment. As relevant to the pending habeas corpus petition, Rembish raised the following four claims: (1) that there was insufficient evidence that he assaulted Allen with the intent to kill, (2) that his right to be free from double jeopardy under the Fifth Amendment was violated because he received multiple punishments for the same offense, (3) that being shackled during trial violated his right

4

to a fair trial, and (4) that his appellate counsel was constitutionally ineffective for failing to raise these and other claims. (*See* R. 6, PageID.742–750.) In a short order, the state trial court denied Rembish's motion. (R. 6, PageID.839.)

Rembish then sought leave to appeal from the Michigan Court of Appeals and the Michigan Supreme Court. The Michigan Court of Appeals denied leave "because [Rembish] failed to establish that the trial court erred in denying his motion." *People v. Rembish*, No. 330258 (Mich. Ct. App. Feb. 26, 2016). And the Michigan Supreme Court denied leave because Rembish "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Rembish*, 887 N.W.2d 191 (Mich. 2016).

**D.**

Rembish then filed the petition for a writ of habeas corpus pending before this Court. Rembish's petition raises six claims: the two on direct appeal recited above and the four from his motion for relief from judgment recited above.

**II.**

The Antiterrorism and Effective Death Penalty Act (AEDPA) (and 28 U.S.C. § 2254 in particular) "confirm[s] that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). If a claim was "adjudicated on the merits in State court proceedings," this Court cannot grant habeas corpus relief on the basis of that claim "unless the adjudication of the claim . . . resulted in a decision" (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d). But if the state

5

courts did not adjudicate a claim "on the merits," this "'AEDPA deference' does not apply and [this Court] will review the claim de novo." *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014).

## III.

### A.

The Court begins with Rembish's claim that the evidence presented to the jury was not sufficient for the jury to find, beyond a reasonable doubt, that he participated in the shooting of Stennett. Rembish argues that he is Caucasian and the only eye witness, Allen, testified that she was "98%" sure that the two shooters were African American. (R. 1, PageID.15.) And, Rembish says that Berg's testimony was not credible and that Kellman (Berg's girlfriend) never said what type of "mistake" he was willing to "man up" to. (R. 1, PageID.17.)

The Michigan Court of Appeals addressed this claim. In addition to reciting many of the facts recounted above, it concluded, "Viewed in the light most favorable to the prosecution, the trial testimony was sufficient to prove that both defendants were involved in the murder and the other offenses for which they stand convicted. Moreover, the testimony established a motive for the murder. . . . [T]he testimony indicated that Rembish and Jones intended to kill the person they believed to have molested Rembish's girlfriend." *People v. Rembish*, No. 308738, 2015 WL 122703, at *2 (Mich. Ct. App. Jan. 8, 2015).

As this was an "on the merits" ruling, § 2254(d) applies. And that means not only does Rembish have to show that, taking the evidence in the light most favorable to the prosecution, no rational juror would have found (beyond a reasonable doubt) that he participated in the shooting of Stennett, *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979), he must additionally show that the Michigan Court of Appeals was unreasonable in finding that Rembish cannot meet *Jackson*'s standard, *see* 28 U.S.C. § 2254(d)(1).

6

This Rembish cannot do. The Court acknowledges that Allen testified that she was quite certain that the two shooters were African American. And Berg did testify under immunity and perhaps had reason to deflect attention away from himself. And maybe the "mistake" that Rembish referenced in Kellman's presence was not the shooting. But it was not unreasonable for the Michigan Court of Appeals to find that a rational juror could have (1) found Berg's testimony believable despite his bias or motives, (2) inferred that the "mistake" was the shooting, (3) found that Rembish had a motive to kill, and (4) found that Allen had doubt about the race of the shooters (it was dark out, after all).

Section 2254(d)(1) bars a writ on Rembish's first habeas corpus claim.

**B.**

Although disguised as an equal-protection claim, Rembish makes another insufficient-evidence claim. He asserts that there was not sufficient evidence to support a conviction of assault with intent to murder Allen. In particular, Rembish claims the evidence did not permit a rational juror to find that Allen was struck or grazed by a bullet, without that finding there could not be a finding of assault, and without a finding of assault there could be no finding of assault with intent to murder. (*See* R. 6, PageID.29–30.) Rather than bringing this claim directly as a violation of the Due Process Clause as construed in *Jackson v. Virginia*, Rembish says that because the proofs were so weak, the prosecution violated the Equal Protection Clause in seeking his conviction as opposed to others. (R. 1, PageID.28, 30.)

If Rembish truly intended to assert a violation of the Equal Protection Clause, he has certainly not proved one. He identifies no other case where the evidence of guilt was similar to the evidence against him but the Saginaw County prosecutor nonetheless decided not to prosecute. *See Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533–34 (6th Cir. 2002)

("The Supreme Court has explained that a claimant alleging selective enforcement of facially neutral criminal laws must demonstrate that the challenged law enforcement practice had a discriminatory effect and that it was motivated by a discriminatory purpose." (internal quotation marks omitted)).

Rembish does no better under *Jackson v. Virginia*.

True, Rembish probably escapes § 2254(d) on any such claim. This is because while he brought an insufficient-evidence claim on direct appeal, the argument was that he was not one of the two shooters. And so even though the Michigan Court of Appeals said, "Viewed in the light most favorable to the prosecution, the trial testimony was sufficient to prove that both defendants were involved in the murder *and the other offenses for which they stand convicted*," *Rembish*, 2015 WL 122703, at *2 (emphasis added), the state appellate court could not have been addressing "on the merits" a claim that the evidence did not show that Allen was assaulted because Rembish had not made that specific argument. And while Rembish did claim that there was not enough evidence that Allen was assaulted in his motion for relief from judgment, here is what that court said of the claim: "Defendant seeks vacation of the sentences/reversal of the convictions raising five claims . . . [t]hird, that his conviction for assault with intent to murder upon Kaiti Allen has no support either in fact or law[.] . . . [C]ontrary to any claim now made, the Court of Appeals did address the sufficiency of the evidence supporting defendant's conviction for assault with intent to murder and in doing so the legal basis for that conviction. The court accordingly sees no basis to revisit the matter." (R. 6, PageID.840.) Failing to "revisit" a matter that was never visited in the first place is not an adjudication "on the merits."

Still, § 2254(d) aside, Rembish must clear the prosecution-friendly standard of *Jackson v. Virginia*. But he cannot. He argues that the only evidence that Allen's wrist had been grazed by a

8

bullet was her own testimony, that when the prosecution directly asked her if she had been struck by a bullet, she conceded that she did not know, and that other evidence suggested that she did not sustain a gunshot wound to her wrist. (R. 1, PageID.29.) But it seems as though Rembish is confusing assault with battery. "The elements of assault with intent to commit murder are (1) an assault (2) with an actual intent to kill (3) which, if successful, would make the killing murder. An 'assault' is defined as 'either an *attempt to commit a battery* or an unlawful act that placed another in reasonable *apprehension of receiving an immediate battery*.'" *People v. Sullivan*, No. 315381, 2015 WL 1542147, at *1 (Mich. Ct. App. Apr. 7, 2015) (emphasis added) (quoting *People v. Starks*, 701 N.W.2d 136, 140 (Mich. 2005)); *cf. People v. Dent*, No. 325562, 2016 WL 2942231, at *2 (Mich. Ct. App. May 19, 2016) ("Notably, the 'assault' element of assault with intent to commit great bodily harm less than murder need only fit the traditional definition of an assault, which 'is usually defined as an attempt or offer with force and violence to do a corporal hurt to another.' *Hence, the offense does not require proof of injury*." (emphasis added)). In other words, under Michigan law, an assault-with-intent-to-murder conviction does not require that the victim have been struck—the defendant need only have attempted to batter the victim or have done an unlawful act that placed the victim in reasonable apprehension of a battery. Rembish has not shown that the evidence at trial failed to show that the shots he or Jones fired did not give Allen a reasonable apprehension of being shot—even if she was not hit in the wrist. So Rembish has not shown that insufficient evidence supports his conviction of assault with intent to murder Allen.

**C.**

Rembish also claims that the prosecutor committed misconduct in two ways.

**1.**

For one, Rembish says that, during closing argument, the prosecutor attempted to use the transcript of Kuebler's interview with the detective as substantive evidence of his guilt. (R. 1, PageID.21.) He stresses that during her testimony, Kuebler said, "I don't recall saying [any] of this. So it's there, you got it highlighted. But I am not saying I said it because I don't recall saying it. . . . My whole story was twisted around." (R. 6, PageID.446.) Yet, during closing argument, the prosecution said, "Danielle Kuebler, you had a chance to listen to her testimony; everything that was recorded was a lie. Somebody is sitting in the a back room at the police department—yeah, maybe we should say that she said this. Let's type it up. You had a chance to watch a video tape of her interview with Andy Carlson slapping her around, beating her down so that she would say anything he wanted—that is not what you saw. What you saw was a very calm conversation. Danielle Kuebler explaining what had happened, that there had been this confession, to her, that they had made a mistake. And the mistake was that they got the wrong guy." (R. 6, PageID.481.) Rembish also argues that the jury's request to see the transcript shows that the jurors thought Kuebler's interview with the police was substantive evidence. (R. 1, PageID.21.)

The Michigan Court of Appeals addressed Rembish's claim about the prosecution's framing of Kuebler's testimony. The state appellate court stated, "With respect to Danielle Kuebler's alleged statements during the police investigation, a large part of which she claimed not to remember at trial, we note that the parties agreed to the use of a video recording of the interview during trial, although it was not admitted into evidence. The parties also agreed that this evidence could only be used as impeachment evidence." *Rembish*, 2015 WL 122703, at *5. The appellate court continued,

> After considering the challenged closing argument statement referring to the interview, we conclude that the statement, while not overtly improper, could have

> been confusing to the jury. Nonetheless, the clear thrust of the argument was that because Danielle was lying about the conditions surrounding the questioning, anything she testified to that was beneficial to the defense, such as her contention that Rembish was injured while he and Jones were just playing around "like they always do" rather than in an attempt to run away from the scene of a crime, should not be credited.
>
> The trial court correctly refused to furnish the transcript to the jury upon request during deliberations because the evidence could only be used for impeachment.
>
> Moreover, the trial court both instructed the jury that the lawyers' statements, arguments, and questions were not evidence and that whether to believe witnesses was a question for the jury to decide, and also provided a specific jury instruction concerning the proper use of Danielle Kuebler's prior statements.
>
> We thus find that defendant is not entitled to relief on this issue.

*Rembish*, 2015 WL 122703, at *5 (paragraphing altered). Although all of this was apparently said in the course of conducting plain-error review, *see id.* ("Defense counsel did not object to these portions of the prosecutor's closing arguments, and thus this issue is not preserved"), plain-error review is still an "on the merits" ruling under § 2254(d). *See Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017).

So was the ruling an unreasonable application of or contrary to the Supreme Court's holdings or based on an unreasonable determination of facts? *See* 28 U.S.C. § 2254(d). *Darden* is the applicable precedent and the test is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). Here, after the prosecution's closing, the trial court instructed the jury as follows: "There has been some evidence that a witness made an earlier statement that did not agree with his or her testimony during the trial. . . . The statement was not made during this trial, so you must not consider it when you decide whether the elements of the crime have been proven." (R. 6, PageID.495.) Then, during deliberations, when the jury asked to see the transcript of Kuebler's police interview, the trial judge told the jury that "we can't

give you a transcript of the interview. It was used in impeaching her that would be part of her testimony if we have that prepared." (R. 6, PageID.518.) Given those instructions and Kuebler's own rejection of her prior statements to the police, this Court cannot say that the Michigan Court of Appeals was unreasonable in finding that the prosecutor's reference to Kuebler's statements to the police did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process," *Darden*, 477 U.S. at 181.

**2.**

Rembish also says that the prosecutor improperly vouched for Berg or bolstered what Berg said. (R. 1, PageID.21.) Rembish refers to these remarks during the prosecutor's closing argument: "And you know what, I couldn't agree with defense counsel more. Sean Berg got some benefit from this, but they are exaggerating what the benefit was to him based on the evidence that you have heard. Accessory after the fact to murder, a five year felony, sure. Felony firearm charge, sure. But he is exposed to a couple of years. It's nothing like what they are suggesting to you, that he was facing any type of a murder charge." (R. 6, PageID.492.) The prosecutor continued, "He broke the law, and he is getting a benefit. And the procedure, as we see it with the grant of immunity, *guess what, the People don't have authority to grant anybody immunity. That comes from a court after a petitioning process*. So that is how that works. And true enough, we asked for it, and we got it." (R. 6, PageID.493 (emphasis added).) The prosecutor added, "There is a saying, you know, sometimes you want to go fishing and catch fish, you might have to touch the worm and bait your hook. And that is something that occurred here." (R. 6, PageID.493.) Rembish says that these remarks amounted to vouching and, in reference to the emphasized language, "cast the court an active partner in the prosecution of Petitioner Rembish." (R. 1, PageID.22.)

The Michigan Court of Appeals, again apparently under the umbrella of plain-error review, also addressed this claim. The state appeals court said,

> The prosecutor did not improperly vouch for Sean Berg by implying that the prosecutor had special knowledge of Berg's veracity.
>
> Defense counsel entered into a lengthy attack on Berg's credibility during closing argument. Counsel argued that Berg had a very good motive to fabricate his story, both because he received a grant of immunity . . . and because he was facing additional unrelated felony charges in Bay County and would likely get a favorable sentencing deal for testifying in the instant case. Defense counsel specifically stated that, because of these other offenses, Berg had a motivation to lie even when he first was questioned by and cooperated with the investigating officers.
>
> In rebuttal, the prosecutor agreed that Berg was getting a benefit, although the prosecutor tried to minimize the extent of Berg's exposure. However, the prosecutor also reiterated that Berg did not have anything to do with the murder, and also indicated that seeking the grant of immunity was calculated in order to catch the bigger 'fish.' Nothing in the challenged statements indicates any secret knowledge on the part of the prosecution. Defendant is not entitled to relief.

*Rembish*, 2015 WL 122703, at *5 (paragraphing altered).

That "on the merits" ruling was not an unreasonable application of *Darden*. *See* 28 U.S.C. § 2254(d). As Rembish urges, perhaps the jury could have interpreted the prosecutor's statements as saying that the trial court was involved in securing Berg's testimony against Rembish. But, as the Michigan Court of Appeals said, the prosecutor's remarks came after defense counsel had attacked Berg in closing, including referencing Berg's immunity. Specifically, Rembish's counsel stated, "Because Sean Berg cooperated with police and gave testimony, as they say truthful testimony, he is not going to be charged with murder. He is not going to be charged with assault with intent to murder. He is not going to be charged with conspiracy to murder. . . . And he is not going to be charged with felony firearm. Incredible consideration just to walk away. . . . So don't overlook that when you think about Sean Berg's testimony. . . . He had a reason to lie, to cover his own butt." (R. 6, PageID.487–488.) Placed in context, the prosecutor's effort to rehabilitate Berg

13

did not deprive Rembish of a fair trial. Or if it did, the Michigan Court of Appeals did not unreasonably conclude otherwise. Rembish has not cleared § 2554(d).

**D.**

Rembish also claims that his Fifth Amendment right to be free from double jeopardy was violated because he received multiple punishments for the same offense. Rembish complains that he is serving life in prison without the possibility of parole for first-degree murder, that he is serving life in prison without the possibility of parole for conspiracy to commit murder, and that he was sentenced on six felony firearm counts which will add another two years to the end of the life sentences. (R. 1, PageID.24.) According to Rembish, his convictions fail the same-element test. *See Blockburger v. United States*, 284 U.S. 299, 304 (1932).

The state trial court may have decided this claim "on the merits" thus triggering § 2254(d). But it is hard to say. The state trial court stated, "Defendant's double jeopardy claims, claims of improper shackling, and jurisdictional claims were previously addressed in this court's prior opinion and order denying defendant's motion for post-appellate relief in File No. 11-035679 FC 4 and need not be re-litigated here." (R. 6, PageID.840.) But, as far as this Court can tell, the opinion and order referenced by the trial court (the one File No. 11-035679) was not made part of the Rule 5 materials.

AEDPA-deference or no, Rembish has not shown he is entitled to a writ of habeas corpus. He makes no effort to show that the crimes he was convicted of have the same elements. Regarding murder and conspiracy to commit murder, Rembish argues, "[t]he Legislature, in enacting the murder statute, subscribed the same elements in MCL § 750.316 and MCL § 750.316a, but added the word 'conspiracy' which infringed on MCL § 750.157." (R. 1, PageID.25.) He adds, "The

14

elements of the conspiracy offense is completely subsumed in the first degree murder offense statute, and double jeopardy forbid double punishment." (R. 1, PageID.25.)

This is not so. Rembish was convicted of first-degree, premeditated murder. That crime requires murder "perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing." Mich. Comp. Laws § 750.316. In contrast, Rembish's conviction under Michigan Compiled Laws § 750.157a requires "conspir[ing] together with 1 or more persons to commit an offense prohibited by law, or to commit a legal act in an illegal manner." Thus, there are different elements. *See People v. Burgess*, 396 N.W.2d 814, 825 (Mich. Ct. App. 1986) ("Each of the offenses in the within case involves proof of a fact not required by the other. Conspiracy requires proof of the unlawful agreement; nothing further is required. First-degree murder requires proof of an unlawful killing of another with premeditation and deliberation.").

As for his six convictions for possessing a firearm while committing a felony, Rembish says, "[T]he Legislature did not subscribe that where the same acts are divided into numerous felonies, the firearm statute, MCL § 750.227b, allows for multiple punishments of (2) years for each count." (R. 1, PageID.25.) But, in fact that is what the state legislature subscribed: "We believe it clear that the Legislature intended, with only a few narrow exceptions, that every felony committed by a person possessing a firearm result in a felony-firearm conviction. Where, as here, the defendant is convicted of separate assaults, we perceive no reason why he may not also be convicted of separate counts of felony-firearm." *People v. Morton*, 377 N.W.2d 798, 801 (Mich. 1985); *see also White v. Howes*, 586 F.3d 1025, 1032 (6th Cir. 2009) ("[T]he [U.S.] Supreme Court has repeatedly described the third aspect of the Double Jeopardy Clause—the protection against multiple punishments for the same offense imposed in a single proceeding—as protecting only against the imposition of punishment in excess of that authorized by the legislature.").

Rembish has not shown he is entitled to a writ on the basis of double jeopardy.

**E.**

Rembish also argues that being shackled during the trial violated his right to a fair trial.

Here is the relevant background.

During a recess from jury selection, a sheriff's deputy in charge of transporting Rembish from lockup to the courtroom informed the judge that when she was letting another person out in lockup, she overheard Rembish say something about her knife. The deputy stated, "I believe his exact words were, If I could borrow that knife, I could get out of here. I could take it and get out of here." (R. 6, PageID.201.) When asked if she thought Rembish had made the remark in a joking fashion, the deputy testified, "At that moment I didn't feel threatened because I was on the outside and he was in the capias. . . . I let Max know when he left, I said you need to watch out for him because he is running his mouth, and, yeah, I am on guard. If I am walking him down here and he doesn't have anything on him, any constants [*sic*], I am on guard." (R. 6, PageID.201.) Rembish's counsel added for the record, "Judge, I just want to say, for the record, that it was a bad choice on the part of my client, but when I did talk to him, Judge, he indicated he was just making a joke." (R. 6, PageID.202.)

Having heard from the sheriff's deputy, the trial judge ruled as follows:

> Because of the nature of these charges and the seriousness of what he said—I don't know it he was being flippant, but he is much bigger than the deputy. And for safety sake, I am not going to shackle his arms, but both defendants will have their legs shackled. I don't believe it will be visible to the jury. And we will not require them to stand when the jury comes and leaves so that it won't be obvious to the jury that they are wearing leg shackles. But if there are any further incidents, their arms will be shackled as well.

(R. 6, PageID.202.)

It is true that, with limited exception, a jury is not supposed to see a criminal defendant in shackles. To be more precise: "[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." *Deck v. Missouri*, 544 U.S. 622, 629 (2005).

Rembish's argument appears to be two fold. First he says that he "simply made a joke about the [deputy's] knife" and implies that if it were not a joke, he would have referenced the deputy's firearm. (R. 1, PageID.32.) Second, he asserts that, after its initial ruling, the trial court never followed up on "whether or not the jury could see the 'shackles' or hear them rattling whenever Petitioner moved at the defense table." (R. 1, PageID.33.)

As noted, it is not clear whether the state trial court ruled "on the merits" of this claim because the trial court's opinion from the other file is not part of the Rule 5 materials.

But even on de novo review, the Court does not find that Rembish has shown that habeas corpus relief is warranted. As the Supreme Court has said, a trial court has some discretion to keep a criminal defendant shackled when it believes that the defendant poses a safety risk. *See Deck*, 544 U.S. at 629. Even if Rembish was in fact joking, Rembish has not shown that the trial court abused his discretion in erring on the side of caution. Indeed, in response to counsel's proffer that Rembish's statement was made in jest, the trial court said, "Well, we can't take it as a joke, unfortunately. So we have to take precautions." (R. 6, PageID.202.) Moreover, Rembish has no evidence that the jury ever saw or heard the shackles—he only says that the trial court failed to

ensure that was not the case. In all, Rembish has not shown that his shackling violated the Constitution.

### F.

Lastly, Rembish says that his appellate counsel was constitutionally ineffective for failing to raise certain of the above claims on direct appeal.

As an initial matter, the Court notes that appellate counsel did assert that the evidence was not sufficient to show that Rembish participated in the shooting and did assert prosecutorial misconduct on the grounds that the prosecutor used Kuebler's interview with the police as substantive evidence and vouched for Berg. So the only claims that appellate counsel could be faulted for not raising are Rembish's claims that the evidence did not show that Allen was assaulted, that his multiple punishments for the same offense violated double jeopardy, and that being shackled during trial violated the Constitution.

Even under de novo review (*but see* R. 6, PageID.840), Rembish is not entitled to a writ of habeas corpus on the grounds that his appellate counsel was constitutionally ineffective. "[T]o succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show that his 'counsel's representation fell below an objective standard of reasonableness' and that there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)). Having reviewed the three claims that Rembish believes appellate should have raised on direct appeal but did not, the Court cannot say that the claims are so strong that it was beyond the realm of reasoned professional judgment to have omitted them from the appeal brief. *See Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) ("The Supreme Court has held that 'the Constitution guarantees criminal defendants only a fair

trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim.'" (quoting *Engle v. Isaac*, 456 U.S. 107, 134 (1982))).

**IV.**

For the reasons given, the Court DENIES Rembish's petition for a writ of habeas corpus.

Before Rembish may appeal that decision, this Court must determine whether to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). For the certificate to issue, Rembish must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). The Court finds that reasonable jurists would not debate the resolution of Rembish's claims. The Court will therefore deny a certificate of appealability.

If Rembish nonetheless chooses to appeal the Court's decision, he may proceed in forma pauperis because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Date: October 19, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record and/or pro se parties on this date, October 19, 2018, by electronic and/or ordinary mail.

s/William Barkholz
Case Manager